# DECISIONS

OF THE

# SUPREME JUDICIAL COURT

OF

# MASSACHUSETTS

TREMONT AND SUFFOLK MILLS *vs.* CITY OF LOWELL.

Middlesex.    April 9, 1929. — March 24, 1930.

Present: RUGG, C.J., PIERCE, WAIT, SANDERSON, & FIELD, JJ.

*Tax*, Assessment, Abatement. *Evidence*, Of value. *Practice, Civil*, Findings by judge, Report by commissioner. *Words*, "Fair cash value."

A Massachusetts textile mill corporation, in a list of its property given to the assessors of taxes of the city where its mills were located, gave in general as to each of its buildings a statement of the machinery in it, together with a description of the size, stories and floor space of the building, stating the number of looms and the number of "spindles." A commissioner, who heard a petition under G. L. c. 59, § 65, for abatement of a tax assessed upon the corporation, found in substance that the term "spindle" had been used by the assessors for many years as the unit for measuring and assessing the machinery of the textile mills of that city, and included all of the operating machinery of every mill so measured and assessed, varying with the different mills according to the extent of their respective manufacturing processes and to comparative valuations determined by the assessors, and, as commonly used in the trade and by the assessors of the textile cities in relation to cotton mills, included all the machinery and appliances necessary to operate the mill in connection with which it might be applied; that the meaning and use of that term was understood by the assessors of the respondent and that there was no suggestion of bad faith on the part of the petitioner. *Held*, that the list submitted by the petitioner as to machinery satisfied the requirements of G. L. c. 59, § 61.

The tax sought to be abated by the petition above described was assessed for the year beginning April 1, 1926, a period of marked depression in the cotton mill industry in New England. Owing to the state of the petitioner's business, it in November, 1926, sold its real estate and machinery for $500,000 to another corporation, which within two months resold two of three divisions thereof for more than that sum, retaining the third division for its own purposes. There were other opportunities at hand for the petitioner to secure a better price at the time of its sale in November. The petitioner asked for a ruling to the effect in substance that the fair cash value of its taxable property on April 1, 1926, was the price for which it was sold in November, 1926. The ruling was refused. *Held*, that it was proper to refuse such a ruling of law: although that sale was competent evidence bearing upon the fair cash value of the property on the taxing date, it was not conclusive on that point.

It was proper to refuse to rule in the proceedings above described that the assessment of the property of the petitioner should be based upon the value of its real estate and power plants based on "their readily realizable cash sale value as of April 1, 1926, irrespective of any other considerations."

The commissioner in his report in the proceedings above described stated that he valued the land and buildings in their respective relations as component parts of the whole taxable property as of April 1, 1926, not only as a large industrial plant operating under a single management but also as susceptible of division into smaller units; that he considered the adaptability of the real estate, as a whole or in parts, to other purposes than the manufacture of cotton fabrics similar in kind to the product of this particular corporation and the conditions which existed locally in the cotton textile industry in 1926; and that, from the viewpoint of realization of fair worth, some time, with consequent accumulations of carrying costs, might be required to find a purchaser or purchasers for the property; and found "the fair cash or taxable value" of the land, buildings and machinery of the petitioner to be certain specified amounts. In another portion of his report he stated that the proceeding "raises the plain issue whether the value for taxation purposes of the fixed physical assets of a manufacturing corporation which is engaged in a great staple industry shall fluctuate with the periods of prosperity and depression of that industry, together with the business success or failure of that particular corporation"; stated that "under such circumstances there are no measures of value which ordinarily obtain under normal conditions, when the vendor sells and the purchaser buys without disadvantage to either party, i.e. as willing traders," and found that in April, 1926, there was no real market for a cotton textile mill of the size and kind of the petitioner's plant. The judge found "the facts to be as set out in the commissioner's report and that on April 1, 1926, the fair cash value of the petitioner's real estate" including land and buildings and taxable machinery was the same as reported by the commissioner, and reported the case for determination by this court. *Held*, that

(1) The statements last above quoted from the commissioner's report did not declare the issue raised in this case as it appeared upon this record; the conceptions of the aspects of valuation for the purpose of taxation under our statute as there declared were not safe guides for assessors;

(2) The assertions, both by the commissioner in his report and by the judge in his findings, that their conclusions were based upon fair cash value meant that, in reaching the valuation of the petitioner's property subject to taxation, the words of the statute as construed, defined and applied in the decisions of this court were followed.

At the hearing by the judge of the Superior Court of the petition above described, the only evidence of the fair cash value of the petitioner's property was the report of the commissioner. *Held,* that, in such circumstances, the trial judge was obliged to follow the findings in the report as to fair cash value unless they were tainted by some error of law or were inconsistent with other findings in the report.

In the proceedings above described, the judge, following findings by the commissioner, found the fair cash value of the petitioner's real estate to be slightly more than that fixed by the assessors, and that of the machinery to be much less. It appeared that the petitioner had paid the tax late and that interest had been added to the amount it paid. The judge included as a part of the tax abated the interest the petitioner had paid on the sum abated up to the time of payment and then ordered the respondent to pay interest at the rate of six per cent, on the amount abated and thus ordered refunded, from the time of the petitioner's payment. *Held,* that the order was right.

PETITION, filed in the Superior Court on January 26, 1927, for abatement of a tax assessed upon the real estate and machinery of the petitioner for the year 1926.

The assessors of the respondent assessed the petitioner's real estate in that year at $1,373,000 and its personal property locally taxable at $3,700,550. Upon these valuations the taxes assessed against the petitioner were $169,456.57, the personal property tax being $123,598.37 and the real estate tax being $45,858.20. The tax rate in Lowell for 1926 was $33.40 per thousand dollars of assessed valuations. The taxpayer was also assessed $62.70 for street sprinkling. The tax bill sent to the petitioner was dated April 1, 1926, and was paid under protest January 22, 1927. The amount then paid was $172,259.83, which included an added item of interest of $2,740.56.

The petition was referred to a commissioner. Material facts found by him are stated in the opinion. He concluded that the assessment upon the petitioner's real estate should

have been $1,375,740 and upon the taxable personal property $1,478,523.25.

The case was heard upon the commissioner's report and no other evidence by *F. T. Hammond*, J.    The petitioner asked for the following rulings:

"1. The petitioner has complied with all the provisions of law relating to the obtaining of an abatement of the taxes assessed upon it in 1926.

"2. The list filed by the petitioner with the assessors on May 11, 1926, as a matter of law complied with the requirements of the statute and entitle it to maintain this petition.

"3a. The fair cash value of the taxable property of the petitioner on April 1, 1926, was $507,373.25, being $500,000 the price for which the plant was sold by the petitioner in November, 1926, plus $7,373.25 the fair cash value as found by the commissioner of certain machinery sold by it as junk soon after April 1, 1926.

"(Or if this ruling (3a) be not given)

"3b. The fair cash value of the taxable property of the petitioner on April 1, 1926, was $1,624,673.25, being the amount set forth by the commissioner in his alternative finding, namely: $406,150 found by him to be the 'readily realizable cash sale value as of April 1, 1926,' of the real estate and power plants plus $1,218,523.25 stated by him in this finding to be the valuation of the operating and manufacturing machinery.

"4a. The petitioner is entitled to an abatement of the taxes and interest paid by it on January 22, 1927, in the sum of $152,510.30 plus interest paid thereon at eight per cent from October 15, 1926, to January 22, 1927, and with interest at six per cent on such total from January 22, 1927.

"(Or if this ruling (4a) be not given)

"4b. The petitioner is entitled to an abatement of the taxes and interest paid by it on January 22, 1927, in the sum of $117,073.93 as found by the commissioner with interest thereon at six per cent from that date.

"5. The value of $1,375,740 found by the commissioner to be the value of the real estate of the petitioner was not

the fair cash value of that property on April 1, 1926 but was substantially in excess thereof.

"6. The value of $1,478,523.25 found by the commissioner to be the value of the machinery of the petitioner was not the fair cash value of that property on April 1, 1926, but was substantially in excess thereof.

"7. The value of $2,854,263.25 found by the commissioner to be the value of the entire taxable property of the petitioner was not the fair cash value of that property on April 1, 1926, but was substantially in excess thereof. .

"8. The value of $2,854,263.25 found by the commissioner to be the value on April 1, 1926, of petitioner's land, buildings and machinery was not the fair cash value on that date of the taxable property constituting the petitioner's plant considered as a unit in that, although the machinery was valued 'as component parts, set up and capable of operation, of a going plant', the real estate, both land and buildings, was valued not only in connection with the machinery installed therein and used for textile manufacturing purposes but also in view of its adaptability as real estate 'to other purposes than the manufacture of cotton fabrics.'"

Of the foregoing, the judge gave the rulings numbered 1 and 2 and denied the others.

The respondent asked for the following rulings:

"2. Upon the commissioner's report the petitioner is not entitled to an abatement of taxes levied by the city of Lowell upon the real estate of the petitioner for the tax year beginning April 1, 1926.

"3. Upon the commissioner's report the petitioner is not entitled to an abatement of taxes levied by the city of Lowell upon its machinery for the tax year beginning April 1, 1926.

"4. Upon the commissioner's report, the petitioner's petition should be dismissed.

"5. The list of real and personal property submitted to the board of assessors by the petitioner for the tax year beginning April 1, 1926, is not such a list as is required by law.

"6. The list filed with the board of assessors for the city of Lowell for the tax year beginning April 1, 1926, was not a true list containing the items required by the commissioner

of taxation under G. L. c. 58, § 5, and did not comply with the statute.

"7. No proper list of real and personal property as provided for and required under G. L. c. 58, § 5, and G. L. c. 59, § 29, was filed by the plaintiff for the tax year beginning April 1, 1926.

"8. The assessors of the respondent city were required by law to assess the property of the petitioner upon the basis of a fair cash value, not a readily realizable cash sale value.

"9. The readily realizable cash sale value is not the basis for the assessment of taxes on real and personal property as required by law.

"10. A readily realizable cash sale value is not that fair cash value which the law requires boards of assessors to adopt in assessing real and personal property."

The judge granted respondent's rulings numbered 2, 8–10, and denied the others.

The judge made the following findings and order:

"I find the facts to be as set out in the commissioner's report and that on April 1, 1926, the fair cash value of the petitioner's real estate in Lowell was $1,375,740.00, of which $401,990.00 was the value of the land and $973,750.00 the value of the buildings, and that the like value of the taxable machinery was $1,478,523.25. The petitioner is granted an abatement of the taxes assessed upon its personal estate as described in the commissioner's report of $75,831.94, with interest thereon at 6 per cent from January 22, 1927, ($9087.19), making in all $84,919.13, and judgment is ordered to be entered for the petitioner against the respondent in the sum of $84,919.13. The petitioner is to have costs."

The judge reported the case for determination by this court.

*W. H. Hitchcock,* (*J. F. Doherty* with him,) for the petitioner.

*H. V. Charbonneau,* for the respondent.

RUGG, C.J.  This is a petition filed under G. L. c. 59, § 65, by way of appeal from the refusal by the assessors of the defendant city to abate taxes assessed upon the complainant. The case was referred to a commissioner and was

heard on his report as the only evidence by a judge of the Superior Court. He found the facts to be as set out in the commissioner's report, including the fair cash value of the complainant's land, buildings and machinery, and granted an abatement. He gave some, and denied other, requests for rulings. Exceptions were saved by each party. The case was then reported.

1. The first question for determination is whether the petitioner filed a sufficient list of its property under G. L. c. 59, § 29, which, by G. L. c. 59, § 61, is a prerequisite to the granting of an abatement. *Central National Bank* v. *Lynn*, 259 Mass. 1, 4. The relevant facts upon this branch of the case are these: A list purporting and intended by the complainant to be a "full, true and accurate list" of all its real and personal estate in Lowell liable to taxation was seasonably sworn to and filed with the assessors. Copy of it is annexed to the report. It appears to be a complete statement of its several parcels of land and of its numerous buildings together with the uses to which the latter were put. It has not been argued that there was any insufficiency in the list so far as it concerns land and buildings. The contention is that it is insufficient as to machinery. As to machinery the list gives in general with each building a statement of the machinery in it. For example as to "Engine Room Building," together with description of its material, size, stories and floor space, occurs this: "It contains Weaving machinery (235 looms) and Carding Machinery." At the end of the list is this: "The total number of spindles reported above is 220,928 and looms 6,284." This list was accepted by the assessors without comment or objection. Further findings of the commissioner on this point are: The list was in substance and form similar to schedules or lists of taxable property made and seasonably filed by the complainant in the years 1924 and 1925. The term "spindle" has been used by the assessors of Lowell for many years, and was so used in 1926, as the unit for measuring and assessing the machinery of the textile mills of that city, and included all of the operating machinery of every mill so measured and assessed, the assessment being x dollars per spindle, varying

with the different mills according to the extent of their respective manufacturing processes and to comparative valuations determined by the assessors. Dwyer (chairman of the assessors) testified that from personal inspections, variously made by all the assessors, the members of the board were familiar with the extent of the manufacturing processes of the Tremont and Suffolk Mills and the character and quantity of its operating machinery. The lists of schedules filed by the petitioner in the years 1924, 1925 and 1926 were intended by the petitioner to be lists of the taxable property of this corporation physically situated in Lowell on the first day of April of the year of disclosure, as called for by the assessors in their annual notice to the taxpayers, and were prepared and filed in compliance with such notice. "I therefore find, if the list filed on May 11, 1926, by the petitioner shall be held in law to comply with the requirements of the statute, and the unit of measuring textile machinery adopted by said assessors is proper and justifiable, that in fact this instrument was prepared, sworn to and filed by the petitioner and accepted by the respondent as a true list of its taxable property on April 1, 1926, and fully informed the assessors of Lowell of the particulars of the real estate of the taxpayer, both land and buildings, and the quantity and character of its operating machinery." At a later point in the report this appears: "At the request of counsel for the petitioner I extend and amplify certain portions of the foregoing report, namely in respect of the use of the word spindle as a unit of measure . . . I therefore find, in adaptation of the finding of the commissioner as reported in *Troy Cotton & Woolen Manufactory* v. *Fall River,* 167 Mass. 517, at page 518, and supplemented by the finding of the court, that the word spindle, as commonly used in the trade and by the assessors of our textile cities in relation to cotton mills, signifies more than the pin and bobbin upon which the yarn is twisted or spun; that it is used as a unit of measure or capacity, and includes all the machinery and appliances necessary to operate the mill in connection with which it may be applied; that the statement of the number of spindles in a mill, more particularly

when the number of looms is also stated as in this case, fairly and adequately signifies to persons acquainted with textile mills the size and capacity of the mill and the quantity of preparatory, spinning, weaving and finishing machinery installed; that the meaning and use of this term was understood by the assessors of Lowell; that the assessors knew the kind and extent of the manufacturing processes of the taxpayer; were also informed by statements contained in the list filed by the petitioner of the nature of such processes conducted in various indicated portions of the plant, as well as given reasonably adequate information of the amount and kind of power machinery; that they were not misled by any statements contained in the list and asked for no further or fuller statement; and that there is no suggestion of bad faith on the part of the petitioner.  I ruled and find that this list was sufficient under the statute."  The assessors made their assessment on the machinery of the petitioner on "a flat rate or unit of measure of $16.75 per spindle."

It is plain that the list as filed although not containing a specified and detailed description and enumeration of each machine owned by the petitioner was nevertheless a sufficient list under the controlling decision of *Troy Cotton & Woolen Manufactory v. Fall River*, 167 Mass. 517, 518, 519, where this precise point was in issue.  A statement of the number of spindles in a cotton mill describes with accuracy to those familiar with the language of the trade the quantity of machinery of the various kinds in the mill.  It was the basis of the valuation adopted by the assessors. Thus it follows that the list as filed was "the equivalent of a catalogue, inventory or schedule itemized in sufficient detail to convey a reasonable understanding of the extent and nature of the subject to which it refers."  *Boston Rubber Shoe Co.* v. *Malden*, 216 Mass. 508, 510.  *Boston & Maine Railroad* v. *Billerica*, 262 Mass. 439, 450.  It is apparent from the list that there was some knitting machinery belonging to the petitioner.  In his summary of valuation the commissioner grouped the machinery outside the power and heating plant as follows: (1) machinery sold as junk about May 1, 1926, (2) spinning frames, (3) looms, (4) mis-

cellaneous other machinery, affixing a gross valuation to each group. This was but a summary. It was not the list filed by the petitioner. There is nothing in these suggestions to shake the effect of the findings that the spindle is a just unit of measure or of capacity of a mill and includes all the machinery and appliances necessary for the operation of the mill even though the number of certain kinds of machines may vary somewhat with the quality or kind of goods produced. *Troy Cotton & Woolen Manufactory* v. *Fall River*, 167 Mass. 517 at page 518.

The rulings of the judge to the effect that the list filed by the petitioner was sufficient and that there had been compliance by the petitioner with all provisions of law as to obtaining an abatement, and his denial of requests of a contrary nature were right.

2. The second question is whether there was error in the findings and rulings of the judge based on the report of the commissioner touching the value of the real and personal estate of the petitioner for purposes of taxation on April 1, 1926. The petitioner contends that such value is governed largely if not wholly by the sale by it in November, 1926, of all its real estate and machinery, thus subject to taxation, to the Nashua Manufacturing Company. The respondent contends that such sale should be disregarded because the transaction did not represent a willing seller and a willing buyer but was under real or fancied compulsion by the seller. The pertinent facts respecting this matter are set forth by the commissioner. The property of the petitioner was a cotton textile plant originating nearly a century ago. For a period immediately preceding 1920 its operations had been profitable and dividends of ten per cent had been paid regularly. Its stock sold in the market for $280 per share. A sharp decline followed this period of prosperity. Heavy losses were sustained in each of the years 1920 to 1925 both inclusive. Its net quick assets dwindled from about $6,000,000 in January, 1920, to about $500,000 in November, 1926. The plant was being run during the years last named at a continuously diminishing proportion of its total capacity for production. This con-

dition was not confined to the business of the petitioner. Beginning with 1920 the cotton mills of New England entered upon a period of depression which continued with varying degrees of acuteness to April 1, 1926. Voluntary or enforced liquidation of many such plants occurred. A large factor contributing to this situation was the substantial growth of the industry in the southern States of the Union. Measured in terms of hours of operation between the years 1922 and 1926, there was a loss in New England of approximately fourteen and three tenths per cent and a gain in the southern States of twenty-two and three tenths per cent. In April, 1924, a new president of the petitioner was elected. He found that the operating equipment of the plant consisted largely of old machinery not in good repair, in part obsolete, and as a whole uneconomical in operation. The power plant was modern and efficient. A new treasurer and a new superintendent of the mills were employed, each exceptionally well qualified. Persistent but unsuccessful efforts were made to effect a combination with some stronger textile concern or to find a purchaser for the property. In the spring of 1926 the financial condition of the petitioner became matter of serious concern. Large banks where it had established borrowing accommodations either refused to renew their loans or were willing to renew only upon payment of fifty per cent at each renewal. In these conditions, apparently becoming daily more unfavorable, certain stockholders requested a special meeting to consider liquidation. Such meeting was held on November 10, 1926. The situation was canvassed. A committee was appointed to investigate and to make recommendations which reported at a meeting on November 18, 1926. An offer of $500,000 for the real estate and machinery constituting the plant was reported from the Nashua Manufacturing Company. Concerning the efforts made to secure an offer for this property the commissioner finds that Ayer, the president of the petitioner, testified as to his endeavors to interest some one of its competitors in the acquisition of the plant, either by way of consolidation or purchase, or by effecting a com-

bination with some large selling organization, and, failing in such attempts, to sell the machinery to some southern concern. Such efforts, almost wholly if not entirely confined to interviews or correspondence with concerns producing the same lines of merchandise, proved fruitless. Although Ayer was a large stockholder in the Merrimack Manufacturing Company, which subsequently acquired from the Nashua Manufacturing Company approximately three fifths of the real estate, and which owned and was operating the mill property next adjoining the Tremont and Lawrence divisions of the petitioner's plant, he did not approach or attempt to interest any officer of the Merrimack Manufacturing Company in regard to the purchase of the property of the petitioner, either as a whole or in part, until after he had talked with the representative of the Nashua Manufacturing Company and then only a day or two before the latter company submitted its formal offer. The inquiry was made by a telegram sent to the treasurer of the Merrimack Manufacturing Company, which elicited the reply that his corporation was not interested. The Merrimack Manufacturing Company was not a competitor of the petitioner. As bearing upon the state of mind of and the actions taken by the stockholders of the petitioner at the meetings held in November, 1926, it was found that the officers, influential directors and large holders of its capital stock were satisfied that the efforts made to find a purchaser for the property from among its competitors or to effect an advantageous consolidation with one of them had been sufficient to eliminate the probability of either such accomplishment; that while such efforts were limited to this group of competitors in one or more of the major lines of output of these mills, it was reasonable to expect that the logical buyer might be found in this field, particularly if the stockholders hoped to dispose of their property as a going business; that no other customer than the Nashua Manufacturing Company was then in sight, and that the possibility of securing any other purchaser for the plant in the near future was uncertain. No comprehensive or persistent attempt appears to have been made to find a

purchaser, either for the property in its entirety or in parts, in any other market or field of industrial enterprise.  At the meeting of the stockholders held to consider the report of the committee and the offer of the Nashua Manufacturing Company, a vote in favor of the acceptance of this offer was passed practically unanimously by something over four fifths of the outstanding shares of stock represented at the meeting.  The sale was concluded and deeds passed on December 21, 1926.  The purchaser immediately sold for $250,000 two of the three divisions of the real estate thus acquired to the Merrimack Manufacturing Company, another manufacturing corporation in a different line of business from that of the petitioner but located nearby.  The purchaser also sold shortly afterward much machinery and miscellaneous mill equipment, partly as machinery and partly as junk, for $277,081.19.  The purchaser was primarily interested in acquiring the third division of the property in order to equip it as a complete or balanced manufacturing unit of approximately forty thousand spindles by the retention of the best of the machinery of the whole plant to be reconditioned and rearranged so as to secure improved and more economical operation.  It had no use for the residue of the real estate or the less desirable or excessive quantity of machinery.  Therefore the immediate resales were made. The commissioner further describes the property subject to taxation as follows: "The real estate involved in these transactions consisted of buildings commonly found throughout New England adapted to manufacturing enterprises of various kinds, well but not extravagantly built, whose intrinsic values in terms of cost of construction or replacement values less depreciation were readily ascertainable, with cheap and relatively abundant water power, equipped with thoroughly modern facilities for transforming this power and additional steam power into electrical energy which could be applied at points of immediate use; and the land upon which these buildings were erected was advantageously located in respect of accessibility, supply of skilled labor, and both railroad and auto truck transportation facilities.  In brief, these properties consisted of a kind

of commodity which has heretofore, not only in Massachusetts but in the industrial sections of the country, had a varying but comparatively ready market, and will undoubtedly continue so to have in the future. The land, buildings and power equipment were not limited in usability to the manufacture of any single product and either as a whole or in parcels, together with much of the machinery, could be operated for the production of varied sorts of textile fabrics, and were also readily adaptable to many kinds of manufacturing enterprises. While in April, 1926, there may have been no immediate market for this plant as a cotton textile mill at a price reasonably commensurate with its cost or replacement value, and I so find, I also find that its fair cash value or taxable value, as a matter of fact, should not be determined by the prices paid either for the plant in its entirety by the Nashua or for a very considerable portion of it by the Merrimack." The commissioner then characterized Lowell as a location for a plant of this nature and went through the entire plant with some detail of description putting a value on each building and the several parcels of land. He followed the same method as to the machinery.

The requests of the petitioner to the effect in substance that the fair cash value of its taxable property on April 1, 1926, was the price for which it was sold in November, 1926, were denied rightly. That sale was made between seven and eight months after the tax date; it was made under conditions which were not necessarily a test of fair cash value; the resale by the purchaser, immediately after its purchase, of two of the three divisions with some machinery for more than the purchase price of the whole plant and the retention by the purchaser of the third division with the best of the machinery constituting thereby a complete manufacturing unit of about forty thousand spindles tend to show that the price for which the whole plant was sold was not its fair cash value. The circumstances attending the sale of the entire plant in November, already narrated, indicate that, even in the business depression of that period, opportunities at hand for securing the best price obtainable at a forced sale were not utilized. The conclusion is that

this transaction was not as matter of law a decisive index of fair cash value and might have been found not to reflect the condition existing when a seller willing but under no compulsion to sell negotiates with a buyer ready and able but under no obligation to buy, each regardful of fair cash values. That sale was competent evidence bearing upon fair cash value of the property on the taxing date, but it was not conclusive on that point. It was to be weighed with all the other evidence bearing upon the question to be decided. So far as it was a proper factor for consideration, the record does not show that it was not given weight.

3. The commissioner made an alternative finding of value of the real estate and power plants of the petitioner based on "their readily realizable cash sale value as of April 1, 1926, irrespective of any other considerations." That standard of valuation is not to be found in our statutes. It is not made by any of the taxing laws of this Commonwealth the basis of assessment for purposes of taxation. It may be a modification of the phrase "readily realizable market value" found in 42 U. S. Sts. at Large, 230, c. 136, § 202 (c) and (e) as amended by 42 U. S. Sts. at Large, 1560, c. 294. The guide for assessors established in our statutes for many years as the basis for taxation is fair cash valuation. Many decisions have been rendered touching the meaning of those statutory words; no one of them affords justification for the adoption of "readily realizable cash sale value" as meaning the same as the standard established by our statutes. When the statutory words in this jurisdiction have been retained for so many years it would be an unnecessary complication to examine the meaning of terms having a more or less similar signification but arising in different connections and without the historical and practical background of our own laws. See for example *Earl of Ellesmere* v. *Commissioners of Inland Revenue*, [1918] 2 K. B. 735; *International Harvester Co.* v. *Kentucky*, 234 U. S. 216, 222.

The refusal of the judge to grant the requested rulings based on that theory of valuation was right. The rulings actually given, that the assessors were not required to make the assessment on "readily realizable cash sale value," were right.

4. The statutory duty imposed on the assessors was to determine for the purposes of taxation the "fair cash valuation of all the estate, real and personal, subject to taxation." G. L. c. 59, § 38. The petitioner is entitled to an abatement if and so far as it is found that it was taxed "upon an assessment of any of . . . [its] property in excess of its fair cash value." G. L. c. 59, § 59, as amended by St. 1926, c. 71, § 2. The meaning of the words "fair cash value" as applied to various kinds of property, both real and personal, has been expounded in numerous decisions. Most of them are collected and reviewed with adequate quotations in *Massachusetts General Hospital* v. *Belmont*, 233 Mass. 190, 205–210, both inclusive. Summarizing the effect of those decisions it there was said at page 208: "The law respecting the meaning and means of finding out the 'fair cash value' in taxation cases is to be followed in the case at bar. It is manifest, however, that 'fair cash value,' as applied to land ordinarily must be ascertained by methods different from those applied to cotton, coal or active stocks, which are dealt with daily in the public market and which therefore have an easily determined cash value. Land commonly is not and cannot be sold at a moment's notice. The value of a tract of land for purposes of sale, that is, its fair cash value, is ascertained by a consideration of all those elements which make it attractive for valuable use to one under no compulsion to purchase but yet willing to buy for a fair price, attributing to each element of value the amount which it adds to the price likely to be offered by such a buyer."

The commissioner, after a detailed description and appraisal of the various elements of value including parcels of land, buildings and groups of machinery belonging to the petitioner, stated the basis of his determination and his conclusion in these words: "I have valued the land and buildings in their respective relations as component parts of the whole taxable property as of April 1, 1926, not only as a large industrial plant operating under a single management but also as susceptible of division into smaller units. I have further taken into consideration the adaptability of the real estate, as a whole or in parts, to other purposes

than the manufacture of cotton fabrics similar in kind to the product of this particular corporation. I have also considered the conditions which existed locally in the cotton textile industry in 1926 and that from the viewpoint of realization of fair worth some time, with consequent accumulations of carrying costs, might be required to find a purchaser or purchasers for the property. I accordingly find the fair cash or taxable value" of the land, buildings and machinery of the petitioner to be certain specified amounts. The judge found "the facts to be as set out in the commissioner's report and that on April 1, 1926, the fair cash value of the petitioner's real estate" including land and buildings and taxable machinery was the same as reported by the commissioner. Thus the finding of the commissioner and of the judge followed the exact words of the statute, namely, "fair cash value" as the basis of determination. In view of the numerous explicit decisions of this court interpreting the meaning of those words in our tax statutes covering a long period of years, it must be presumed that men learned in the law followed the meaning thus declared and did not interpolate into the facts of this case any conception of the signification of those words at variance with established principles. No requested rulings were refused by the judge nor were any rulings made by him tending to show that he did not follow correct rules of law in deciding the case. It is not necessary to review or cite the earlier decisions analyzed in some detail in *Massachusetts General Hospital* v. *Belmont,* 233 Mass. 190. They are all in mind in reaching this conclusion. *Westport* v. *County Commissioners,* 246 Mass. 556, 562. *Donovan* v. *Haverhill,* 247 Mass. 69, 71. *Boucher* v. *Hamilton Manuf. Co.* 259 Mass. 259, 268. *Massachusetts General Hospital* v. *Belmont,* 238 Mass. 396, 402.

A question of difficulty arises from a further statement in the report of the commissioner in these words: "This appeal raises the plain issue whether the value for taxation purposes of the fixed physical assets of a manufacturing corporation which is engaged in a great staple industry shall fluctuate with the periods of prosperity and depression of that in-

dustry, together with the business success or failure of that particular corporation. Whether the value of such assets shall depend upon their successful use, as seems to be the fashion set by quotations from our stock exchanges, or their intrinsic worth. Whether our assessors shall make a careful study of trade papers, federal trade reports and the annual balance sheets of their local corporations before attempting to make up each year their valuation schedules. Whether, in brief, such common values shall remain fairly constant or shall be subject to violent fluctuations, and shall further vary not because of differences in kind but because of differences in use. Times of depression are invariably times of timidity if not of panic. Commodities which the owners are too scared to keep or which they are forced to sell — whether stocks and bonds, corn or pork, cotton and wool or textile plants — find purchasers only among the more courageous at their own bargain prices. Under such circumstances there are no measures of value which ordinarily obtain under normal conditions, when the vendor sells and the purchaser buys without disadvantage to either party, i.e. as willing traders. I have found that in April, 1926, there was no real market for a cotton textile mill of the size and kind of the petitioner's plant. It is a matter of common knowledge that such textile mills or plants located in the principal textile communities of Massachusetts as have been sold or offered for sale since April, 1926, have sold for or are being offered at prices which approximate ten per cent of either their assessed or depreciated replacement values."

This statement does not declare the issue raised in this case as it appears upon this record. The question for our decision is not as thus stated. It is the duty of the assessors within reasonable limits to seek light from every available source bearing on the "fair cash value" of all property to be assessed by them for purposes of taxation. Taxable value does not rest finally upon commercial disaster or prosperity attaching to a particular manufacturing plant as distinguished from other property of the same general nature. On the other hand, periods of great general business depression actually affecting the cash which in exchange for

the property a willing buyer would give and a willing seller take, not as a matter of fleeting fluctuation but of matured financial judgment covering a measurably substantial time, must be regarded by the assessors and reflected in the assessed valuation. Times of panic sufficiently long in duration to affect fair cash value when sales occur must be reflected in assessed valuation. The conceptions of the aspects of valuation for the purpose of taxation under our statute as declared in the quotation just made from the report of the commissioner are not safe guides for assessors.

We draw the inference from the report of the commissioner as a whole and from the findings of the judge that, in reaching the ultimate figures of fair cash value, the test as to the ascertainment of fair cash value of land for the purpose of taxation already quoted from 233 Mass. at page 208 was followed and that hence there is no reversible error. The assertion, both by the commissioner in his report and by the judge in his findings, that their conclusions were based upon fair cash value, we interpret to mean that in reaching the valuation of the petitioner's property subject to taxation the words of the statute as construed, defined and applied in the decisions of this court were followed. There is nothing in the rulings given or in the requests for rulings denied which leads to a different conclusion or which throws substantial doubt on the inference which we draw that this correct test was followed. The statement last quoted from the report of the commissioner has a tendency to cloud but not to obscure to the point of doubt what appears to us to have been the right statutory standard adopted and results reached.

Fair cash value of the property of the petitioner was itself a question of fact. The finding of the commissioner on that point is clear and categorical. It is made *prima facie* evidence by G. L. c. 59, § 67. *National Bank of Commerce* v. *New Bedford,* 175 Mass. 257, 260. *Hollis* v. *Lynn,* 237 Mass. 135, 139. In arriving at fair cash value of the property of the petitioner there was no violation of the principles set forth in *Troy Cotton & Woolen Manufactory* v. *Fall River,* 167 Mass. 517, and in *Tremont & Suffolk Mills* v. *Lowell,* 163

Mass. 283. Since the only evidence on the fair cash value was the report of the commissioner, the trial judge was obliged to follow it unless it was tainted by some error of law or inconsistent with other findings in the report. *Wakefield* v. *American Surety Co. of New York,* 209 Mass. 173, 176. Whether there was error or inconsistency is a question of law open to the petitioner. *Atlantic Maritime Co.* v. *Gloucester,* 214 Mass. 348, 350. For the reasons already stated a majority of the court are unable to perceive any such error or inconsistency.

5. The petitioner did not pay its tax promptly when due but at a later date and hence was required to pay interest thereon as specified in G. L. c. 59, § 57, as amended by St. 1926, c. 269, § 2. The last sentence of that section is in these words: "In all cases where interest is payable it shall be added to and become a part of the tax." The commissioner and the judge in adopting his figures rightly included as a part of the tax abated the interest included therein up to the time of payment and then ordered interest on the amount abated and ordered refunded from the time of payment at the rate of six per cent. G. L. c. 59, § 69.

Every contention presented by each party has been carefully considered. It is not necessary to extend this discussion further. There was no error committed by the trial judge in rulings made or in denying requests for rulings. No reversible error appears on the record.

The decision of the judge, that "The petitioner is granted an abatement of the taxes assessed upon its personal estate as described in the commissioner's report of $75,831.94, with interest thereon at 6 per cent from January 22, 1927 ($9087.19), making in all $84,919.13, and judgment is ordered to be entered for the petitioner against the respondent in the sum of $84,919.13. The petitioner is to have costs," was right and is affirmed. The details of the judgment to be entered are to be fixed in the Superior Court on the footing of this finding.

*So ordered.*