## FOXBORO ASSOCIATES *vs.* BOARD OF ASSESSORS OF FOXBOROUGH.

Suffolk.  December 10, 1981. — April 1, 1982.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Taxation*, Real estate tax:  assessment, value.  *Evidence*, Value, Reproduction cost, Expert opinion.  *Witness*, Expert.

In a proceeding before the Appellate Tax Board to determine the proper real estate tax assessment on certain property located in the town of Foxborough, the board had objectively adequate reasons for disregarding the opinion offered by the taxpayer's expert regarding the fair cash value of the property as evidence substantially lacking in probative force.  [681-683]

In a proceeding before the Appellate Tax Board to determine the proper real estate tax assessment on the New England Harness Raceway in the town of Foxborough, the board did not err in admitting and relying on evidence based on the depreciated reproduction cost method of calculating real estate value introduced by the board of assessors.  [685-689]

In a proceeding before the Appellate Tax Board to determine the proper real estate tax assessment on the New England Harness Raceway in the town of Foxborough, there was no merit to the taxpayer's objections that the assessors' appraiser was not qualified as an expert in racing to give an opinion on the feasibility of reproducing the taxpayer's buildings and that the appraiser apparently had competing business interests with the taxpayer at the time of the appraisal.  [689-690]

In a proceeding before the Appellate Tax Board to determine the proper real estate tax assessment on the New England Harness Raceway in the town of Foxborough, evidence supported the board's finding that the assessors' engineer was qualified to testify as an expert on the cost of reproducing the taxpayer's buildings although he had never been involved with the construction of a horse racetrack; there was no merit to the taxpayer's contention that the engineer should not have been allowed to testify unless he had knowledge of construction costs in the town of Foxborough itself.  [690-691]

APPEAL from a decision of the Appellate Tax Board.

*Mark J. Witkin* for the taxpayer.

*John M. Lynch* for Board of Assessors of Foxborough.

LYNCH, J. This is an appeal by Foxboro Associates (taxpayer), pursuant to G. L. c. 58A, § 13, from the Appellate Tax Board's (board) determination of the fair cash value[1] on January 1, 1977, of property in Foxborough owned by the taxpayer and known as the New England Harness Raceway (property). The board of assessors of Foxborough (assessors) denied the taxpayer's application (G. L. c. 59, § 59) for abatement of the real estate tax assessment applicable to the property during fiscal year 1978. On the taxpayer's appeal to the board under the formal procedure (G. L. c. 59, §§ 64 & 65), the board found that the taxpayer's property had been overvalued and ordered a partial abatement. We find no error.

The New England Harness Raceway is the only harness racetrack in Massachusetts. The property consists of 200 acres of land and over ninety buildings. It has been operated as a raceway for approximately thirty years and is licensed and regulated by the State Racing Commission. The taxpayer purchased the property from Bay State Harness Horse Racing and Breeding Association, Inc., on November 30, 1976, and was thus the assessed owner of the property on January 1, 1977, the relevant date for purposes of the challenged tax assessment.

On January 1, 1977, the assessors assessed the property at $3,508,305. The parties stipulated before the board that "the ratio of assessment to full value was 52½ % for fiscal year 1978." When this ratio is recognized, the assessed value translates to a fair cash value of $6,682,486. In its petition to the board, the taxpayer alleged that its property had been both overvalued and disproportionately assessed. The issue of disproportionate assessment was disposed of by a stipulation.

---

[1] Fair cash value or fair market value is "the price an owner willing but not under compulsion to sell ought to receive from one willing but not under compulsion to buy." *Boston Gas Co.* v. *Assessors of Boston*, 334 Mass. 549, 566 (1956).

The board held a hearing on the taxpayer's petition (G. L. c. 58A, § 8) and also took a view of the property. The board found that the fair cash value of the property was $6,500,000, resulting in an assessed value of $3,412,500 after application of the stipulated disproportionality ratio. Accordingly, the board ordered a reduction in the assessment of $95,805 and an abatement in the tax of $7,108.70. The assessors have not appealed.

Three witnesses testified on the issue of valuation. The taxpayer's witness, a real estate appraiser, relied on the sale of the property to the taxpayer, and "considered" the income capitalization approach to valuation to reach a fair cash value of $3,354,000 for the property. The assessors relied on the depreciated reproduction cost (DRC) method of calculating real estate value. A licensed civil engineer testified for the assessors on the cost of reproducing the buildings. The assessors' real estate appraiser set a value for the taxpayer's land and added it to the engineer's figure for reproduction cost to arrive at an over-all value of $9,593,480 for both the land and buildings.

The taxpayer's principal contention is that the board erred by admitting and relying on the DRC evidence offered by the assessors. This contention is set forth in several subsidiary arguments which we discuss in more detail below. The taxpayer also argues that the board's determination of value was not supported by substantial evidence and that the board "wrongfully rejected" the opinion of the taxpayer's witness on fair cash value.

1. *The taxpayer's evidence.* It is clear, as argued by the taxpayer, that decisions of the board must be supported by "substantial evidence." We discussed the substantial evidence test at length in *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 465-466 (1981). In reviewing a decision of the board under the substantial evidence test, we consider the record as a whole. *Id.* at 466. The board's findings will stand unless "the evidence points to no felt or appreciable probability of the conclusion or points to an overwhelming probability of the contrary." *Id.*, quoting

from L.L. Jaffe, Judicial Control of Administrative Action 598 (1965). Because the board's treatment of the evidence introduced by the taxpayer is critical to a resolution of the taxpayer's claims of error, we turn first to an analysis of that evidence.

As previously noted, the taxpayer's expert witness set the fair cash value of the property, including both land and buildings, at $3,354,000. In arriving at this figure he placed "great weight" on the price of $3,600,000 recited in a deed to the taxpayer dated November, 1976, of a large parcel including the subject property. This deed was given as part of the sale to the taxpayer of the entire raceway business for a total price of $9,650,000. The witness rejected the DRC method of valuation because of the age of the buildings and, while he gave "some weight" to the income capitalization method of calculating value, "the weightiest approach" in his mind "was the price paid for the property by the present owners."

The board found that the price of $3,600,000 appearing on the deed was "unilaterally determined by the seller" and that there was no agreement between the parties to the sale as to what portion of the total purchase price was allocable to the real estate. As a consequence, the board was "not persuaded that the $3,600,000 of consideration recited on the deed was the actual purchase price of the real estate." For this reason the board gave no weight to the expert's opinion of value based on this sale.

It is true, as the taxpayer argues, that actual sales of property usually furnish strong evidence of market value, provided they are arm's-length transactions and thus fairly represent what a buyer has been willing to pay for the property to a willing seller. *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 469 (1981). *First Nat'l Stores, Inc.* v. *Assessors of Somerville*, 358 Mass. 554, 560 (1971). We have never said, however, that the sale price recited in the deed provides conclusive evidence of fair cash value. See *Tremont & Suffolk Mills* v. *Lowell*, 271 Mass. 1, 15 (1930). In this case, the board was amply justified in disregarding

the estimate of value offered by the taxpayer based on this sale. No witness for the taxpayer offered any explanation of the source of the figure of $3,600,000 which appears on the deed to the taxpayer. The taxpayer's expert witness testified that he was not aware how the price on the deed was determined and had made no independent investigation to determine whether the sale was a true arm's-length transaction. The board's finding that the $3,600,000 figure had been "unilaterally determined by the seller," and was not the product of any agreement of the parties, is based squarely on testimony given by one of the taxpayer's partners. Even in its brief in this court the taxpayer offers no logical reason for us to conclude that this figure represents fair market value. The taxpayer made no effort to show the value of the other assets sold in the transaction. Nor did it seek to demonstrate the objective reasonableness of the $3,600,000 figure by any other method.

In these circumstances, the board had objectively adequate reasons for disregarding the opinion of value offered by the taxpayer as evidence "substantially lacking in probative force." *New Boston Garden Corp., supra* at 468. "The board was not required to accept the opinion expressed, or the valuation principles used, by [the taxpayer's] expert witness." *Assessors of Nahant* v. *Costin*, 356 Mass. 726, 727 (1969). See also *Assessors of Lynnfield* v. *New England Oyster House, Inc.*, 362 Mass. 696, 700 (1972).

The taxpayer's expert testified that he gave "some weight" to the income capitalization method of valuation. The board gave no weight to this approach because it found that he did not in fact rely on it to reach his estimate of the value of the taxpayer's property. This finding is supported by this witness's testimony that he believed the recent sale of the property would yield a more accurate indication of value than the capitalization of income method. He stated that he considered income data but did not use it in reaching his opinion. He indicated that the income capitalization method would produce a very low figure (apparently $1,600,000) which he believed did not accurately reflect the

value of the taxpayer's property. There is therefore no indication that the income capitalization method played any role in the $3,354,000 figure given by the taxpayer's expert as the value of the property.

The taxpayer objects to some statements in the board's report which are critical of the income and expense figures introduced in its behalf. Since its expert never reached an opinion of value based on income capitalization principles, the taxpayer was not prejudiced by any error in the board's understanding of these figures.

There is no basis for the taxpayer's further claim that the board "rejected" or "ignored" the evidence introduced through its expert. The taxpayer's evidence of value was admitted and given full consideration by the board. Moreover, the board gave some weight to the opinion of the value of the land offered by the taxpayer in reaching its own determination of fair cash value.

In an appeal to the board from the denial of a tax abatement, the taxpayer bears the burden of proof on the issue of overvaluation. *Schlaiker* v. *Assessors of Great Barrington*, 365 Mass. 243, 245 (1974). Until the taxpayer sustains his burden, the valuation made by the assessors will be presumed valid. *Id.* In applying these principles, we have cautioned that "evidence of a party having the burden of proof may not be disbelieved without an explicit and objectively adequate reason." *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 470-471 (1981), quoting from L.L. Jaffe, Judicial Control of Administrative Action 598, 607 (1965). We have held that the board in this case gave "objectively adequate" reasons for disbelieving the opinion of value offered by the taxpayer. Because the board granted a partial abatement to the taxpayer, it is clear that the board found that the taxpayer had borne its burden of showing overvaluation. In these circumstances it was the board's duty to determine the fair market value of the property. *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. 60, 64 (1941). We therefore turn to a consideration

of the taxpayer's challenge to the board's determination of fair market value.

2. *The assessors' evidence and the DRC method.* The assessors' evidence of fair cash value (which, it should be noted, exceeded by more than $6,000,000 the assessed valuation and approached the price paid for the real estate, personal property, leases and licenses when the taxpayer acquired the property in 1976) was based on the DRC method. A licensed civil engineer testified that the estimated reproduction cost of the buildings, less depreciation, was $6,610,980.

A real estate appraiser called by the assessors used the "comparable sales" approach to set a value of $2,982,500 (or about $15,000 an acre) for the taxpayer's land. He added this figure and the engineer's figure to arrive at a total value of $9,593,480 for the land and buildings. No allowance was made for functional or economic obsolescence. The assessors' appraiser gave his opinion that, in the event the taxpayer's facilities were destroyed, reproduction would be both physically possible and economically feasible. He testified further that he did not use the comparable sales approach with respect to the buildings because of a lack of comparable sales, and he rejected the capitalization of income approach because the income generated by the racetrack was strongly affected by factors unrelated to value (for example, the quality of management and the number of racing dates allowed by the State Racing Commission).

The taxpayer offered the testimony of several witnesses to the effect that its facility was badly deteriorated and out-of-date. The president and general manager of the taxpayer testified that many of the barns and the paddock area were in very bad condition and that repairs were needed in the three major improvements, the grandstand, the clubhouse, and the hall of fame building. The presiding judge of the track testified that about seventy-five per cent of the stable area consisted of extremely run-down original stalls. The president of New England Harness Raceway, Inc. (the operator of the track), testified that the taxpayer's facility was

"obsolete" in many ways; that it had been built to handle crowds of 17,000 to 20,000 whereas current crowds never exceeded 8,000 to 9,000; that it lacked modern betting and television equipment; that there had been a serious decline in "handle" (the total amount wagered) at the taxpayer's track and at other New England tracks; and that several other racetracks had either gone out of business or been converted for dog racing.

Each of these three witnesses testified, on direct examination by counsel for the taxpayer, that, if the facility were destroyed, it would not be rebuilt in precisely the same form. On cross-examination, however, each testified that it would be rebuilt.

The taxpayer also introduced in evidence the 1978 Report of the Governor's Select Committee on Racing concerning the state of the racing industry in Massachusetts. The report notes the poor condition of the stable area at the taxpayer's track and the decline in attendance.

On this and other evidence (including its own view of the property) the board found that the DRC approach was the best method of determining the value of the property. It accepted the cost estimates offered by the assessors but increased the allowance for physical depreciation "because of the age and condition of the property." The board added an allowance for functional obsolescence to take account of declining attendance and the resulting waste of space at the racetrack. In the board's opinion, "a somewhat smaller facility would be more appropriate." The board deducted a total allowance of $3,165,163 for depreciation and obsolescence from the assessors' cost estimate of $8,065,163 to reach a value of $4,900,000 for the buildings.

With respect to the value of the land, the board noted that the assessors' appraisal of $15,000 an acre was based on a comparison with land sales in nearby areas which had involved much smaller parcels. Similarly, the board pointed out that the taxpayer's appraisal of $4,000 an acre was based solely on its expert's general knowledge and not on comparison with other sales. On this evidence the board set

a value of $8,000 an acre or $1,600,000 for the taxpayer's land. Thus the board reached a total value of $6,500,000 for both land and buildings. The taxpayer strenuously objects to the board's reliance on the DRC method.

"Reproduction cost, less accrued depreciation and a reasonable deduction for obsolescence" has long been a recognized method of estimating the fair cash value of property in this Commonwealth. *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. 60, 66 (1941). See also *Correia* v. *New Bedford Redevelopment Auth.*, 375 Mass. 360, 362 (1978) (taking by eminent domain).[2] "[W]hile introduction of evidence based on the DRC method is generally disfavored, such evidence may be introduced in certain circumstances where reliable data based on the other methods is not available." *Id.* at 364. We have said that DRC evidence may be particularly relevant in the case of "properties not frequently bought or sold which are used for a special or unusual purpose . . . ." *Lipinski* v. *Lynn Redevelopment Auth.*, 355 Mass. 550, 551 (1969). See also *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Auth.*, 335 Mass. 189, 193-195 (1956). In *Correia*, however, we explicitly rejected the suggestion that DRC can only be used if it is "a practical impossibility" (*Correia, supra* at 365) to determine value by methods such as comparable sales or capitalization of income. Instead, we held that "[t]he rule of disfavor . . . should be viewed as one of need, not 'impossibility'" *Correia, supra* at 367.

Under the circumstances of this case we cannot say that the board erred by admitting and relying on the DRC evidence introduced by the assessors. The board was amply justified in concluding that no other reliable data were available to assist it in its determination of the value of the taxpayer's improvements. Witnesses for both parties testi-

---

[2] "The standard of 'fair cash value' used in tax assessment cases is ordinarily the same as that used to fix damages for a taking by eminent domain." *Mashpee Wampanoag Indian Tribal Council, Inc.* v. *Assessors of Mashpee*, 379 Mass. 420, 421 n.1 (1980).

fied that the income capitalization method was not an appropriate way to value the property and neither party produced comparable sales evidence for the board's consideration. There was no error in the admission of the DRC evidence.

The taxpayer further argues that the board erred in failing to make a finding, based on substantial evidence, that reproduction of the taxpayer's facility would be economically feasible. The rule established in our cases is that DRC evidence may be received "where the structures . . . remai[n] reasonably well adapted to the special purposes for which they [are] employed and [have] not been shown to . . . [be] in such condition as to make reproduction unlikely or imprudent . . . ." *Correia* v. *New Bedford Redevelopment Auth.*, 375 Mass. 360, 364 (1978). The taxpayer appears to argue that the board must find that the structures could feasibly be reproduced in exactly the same form before DRC evidence is appropriate. This is not the rule. It is only necessary that reproduction of "essentially the same type of structure" be reasonable. *Commonwealth* v. *Massachusetts Turnpike Auth.*, 352 Mass. 143, 148 (1967). Adjustments in the basic reproduction cost figure may then be made to account for physical depreciation and functional or other obsolescence. *Id.* at 149. It is enough that the final adjusted figure tends to show "what the owner would have to pay to obtain *approximately* the same still desirable and useful structures, *after taking into account age, wear and tear, and observed obsolescence*" (emphasis supplied). *Id.*

We find the board's treatment of the feasibility of reproduction adequate. The board stated explicitly that it did not consider the age of the taxpayer's buildings to be a bar to use of DRC evidence. It noted testimony offered by the taxpayer that reproduction was feasible. Finally, the board took a significant allowance for depreciation and obsolescence expressly because of the "age and condition" of the property and the fact that it was larger than current demand required. There was substantial evidence to support the implicit finding that reproduction was feasible.

We do not say that a report such as that made by the board in this case would in all cases meet the requirement that the board "find supporting subsidiary facts and . . . set forth reasons for its conclusion." *New Boston Garden Corp.* v. *Assessors of Boston, supra* at 467, quoting from *Assessors of Lynnfield* v. *New England Oyster House, Inc.,* 362 Mass. 696, 700 (1972). Here, though, the type of case presented by the taxpayer left the board with no choice but to rely on the DRC evidence and the only figures available were those provided by the assessors. The only credible evidence of value was that introduced by the assessors.

The taxpayer, who bore the burden of proving overvaluation, is hardly in a good position to complain, as it does, that the allowance for depreciation and obsolescence taken by the board was neither adequately explained nor supported by substantial evidence. The board's decision to deduct from the assessors' replacement cost figure a much larger allowance for depreciation and obsolescence than the assessors had suggested was, in all likelihood, a response to the taxpayer's evidence of physical deterioration at the racetrack. None of the taxpayer's witnesses offered the board a detailed analysis of deterioration at the racetrack or suggested an appropriate figure for an allowance. The evidence, however, did support a conclusion that parts of the facility were badly deteriorated, that many buildings were in need of modernization, and that the facilities for patrons were as much as one hundred percent larger than necessary. "We have not in the past required the board to specify the precise manner in which it determined the fair cash value of the subject property." *New Boston Garden Corp.* v. *Assessors of Boston, supra* at 467. We cannot say that the board's allowance of almost forty percent of the reproduction cost for depreciation and obsolescence was not supported by the record in this case.

The taxpayer claims that the assessors' appraiser was not qualified "as an expert in racing" to give an opinion on the feasibility of reproducing the subject improvements. At the hearing before the board, counsel for the taxpayer stipulated

to this witness's qualification as a real estate expert and appraiser. Counsel failed to object when he was asked whether reproduction was feasible and never moved to strike the testimony on this point. This court does not consider issues which do not appear to have been raised before the board. G. L. c. 58A, § 13. The taxpayer also makes much of the fact that the assessors' appraiser apparently had business interests which placed him in competition with the taxpayer at the time he appraised the racetrack and, allegedly, had a limited knowledge of the racing industry. The answer to these objections is that "[t]he weight to give to the testimony of a witness, after the disclosure by cross-examination of possible but not fatal weaknesses in that testimony, is clearly for . . . the board." *Assessors of Lynnfield* v. *New England Oyster House, Inc.*, 362 Mass. 696, 702 (1972).

The taxpayer argues that it was error for the board to allow the assessors' engineer to testify as an expert on the cost of reproducing the taxpayer's buildings. The assessors correctly point out that the qualifications of witnesses is essentially a question of fact for the board and the board's decision can be reversed only if there is no evidence to support it. *Boston Gas Co.* v. *Assessors of Boston*, 334 Mass. 549, 573 (1956). The evidence clearly supports the board's finding that the witness was qualified as an expert on reproduction costs. The fact that this engineer had never been involved with the construction of a horse racetrack did not make him incompetent to testify. *Boston Gas Co.* v. *Assessors of Boston, supra* at 573-574.

The taxpayer also contends that the assessors' engineer should not have been allowed to testify unless he had knowledge of construction costs in Foxborough itself. It cites *Assessors of Lynnfield* v. *New England Oyster House, Inc.*, 362 Mass. 696 (1972), where this court upheld the board's refusal to allow testimony on reproduction costs from a witness with very limited experience in commercial construction in Massachusetts and a lack of professional training as a construction engineer. *Id.* at 698. Although it is true that we later described the witness as "unqualified to

testify as to construction costs in the Lynnfield area" (*id.* at 701), the board's rejection of the proffered testimony did not rest on such a narrow ground and we do not read the opinion as supporting the taxpayer's contention.

We recognize, in conclusion, that special purpose properties such as the taxpayer's pose unusual problems of valuation and that no particular method of valuation may be entirely satisfactory. Nevertheless, the owner of such property is not thereby relieved from the burden of introducing credible evidence of value in a proceeding before the board to obtain an abatement of taxes. Given the type of evidence relied on by the taxpayer in this case, the board might have been warranted in sustaining the original assessment on the ground that the taxpayer had not met its burden of proof under *Schlaiker* v. *Assessors of Great Barrington*, 365 Mass. 243 (1974). Instead, the board found overvaluation established and adopted the valuation method suggested by the assessors. Allegations in this court that the board erred in using the DRC method do not excuse the taxpayer's failure to assist the board in making a determination of value.

The decision of the Appellate Tax Board is affirmed.

*So ordered.*