EDWARD C. DONLON & another[1], special administrators,
  vs. BOARD OF ASSESSORS OF HOLLISTON.

Suffolk.  March 10, 1983. — August 8, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Taxation,* Real estate tax: abatement; Appellate Tax Board: filing of appli-
cations, jurisdiction. *Evidence,* Value.

Administrators of a decedent's estate were required to pay the assessed
   real estate tax as a prerequisite, under G. L. c. 59, § 59, to their seek-
   ing abatement of real estate tax on parcels of land owned by nominees
   of the decedent and by two corporations in which the decedent held
   stock, with the result that where, in their petitions to the Appellate
   Tax Board, the administrators specifically stated that "no tax has been
   paid," the board was without jurisdiction to hear their appeals from
   denial of abatements. [853-854]
On an appeal by the administrators of a decedent's estate from denial of
   abatements of real estate taxes on subdivision lots assessed to the estate,
   the Appellate Tax Board was warranted in according little weight to
   opinions of the administrators' appraiser, which were based on incon-
   clusive percolation tests and on the erroneous assumption that the lots
   could not be built upon because of rescission of approval of subdivision
   plans. [856-857]
In the circumstances, the price paid at a foreclosure sale of certain parcels
   of real estate was of limited relevance in establishing the property's fair
   market value. [857]
An undated map offered in evidence before the Appellate Tax Board pro-
   vided no persuasive evidence in support of parties' contention that two
   adjacent lots in a subdivision were in common ownership and thus
   were  not covered by a "grandfather" provision of the zoning by-law
   making them eligible to be built upon. [857-859]
Since real estate taxes for the fiscal year 1979 were assessed as of January 1,
   1978, on the fair cash value of subdivision lots, a municipal planning
   board's later action in rescinding its approval of the subdivision plans
   was, in the circumstances, without effect on the assessment as so estab-
   lished. [859]

---

[1] Edward R. Lembo.

On an appeal from the denial of real estate tax abatements on certain sub-
division lots, the Appellate Tax Board was entitled to conclude that the
appellants had not shown that ground water considerations would pre-
clude building on the lots. [859-860]

Parties appealing the denial of real estate tax abatements with respect to
subdivision lots failed to demonstrate that any overvaluation resulted
from the assessors' alleged practice of assessing lots on unbuilt streets at
the same value as those on existing public ways. [860-861]

Where the appellate tax board had given inadequate consideration to the
wetland composition of certain subdivision lots, as evidenced by a
town's floodplain zoning map which indicated that the lots, each con-
taining between 0.41 and 0.45 acres, included municipally protected
wetlands covering from five to eighty percent of their areas, and
where nothing in the record before the board indicated that a variance
could be obtained to permit the lots to be built upon, this court in-
structed the board to reconsider the fair cash value of the lots in light
of their wetland composition. [861-862]

An engineer's testimony respecting percolation tests he had conducted did
not, in view of the limited number of such tests and the record evi-
dence of their location, constitute persuasive evidence before the Ap-
pellate Tax Board that certain subdivision lots could not be built upon
and thus were overvalued. [862-863]

The Appellate Tax Board could properly conclude that an appraiser's
opinion as to the need for filling certain subdivision lots before they
could be built upon, and the cost of such fill, was unsupported. [863]

Evidence in a proceeding before the Appellate Tax Board warranted the
board's finding that certain applications for abatement of real estate
taxes had not been filed with the municipal board of assessors within
the time limited by G. L. c. 59, § 59. [863-865]

APPEALS from decisions of the Appellate Tax Board.

*Edward C. Donlon* for the plaintiffs.

*William H. Clancy* for the defendant.

O'CONNOR, J.   Edward C. Donlon and Edward R. Lembo
(appellants), the special coadministrators of the estate of
Angus J. McPherson, appeal pursuant to G. L. c. 58A, § 13,
from two decisions of the Appellate Tax Board (board), one
rejecting claims of overvaluation of real estate for fiscal 1979,
and one dismissing a similar claim for fiscal 1980.[2] The prop-

[2] The fiscal year of all cities and towns of the Commonwealth begins
July first and ends the following June thirtieth.   G. L. c. 44, §§ 56, 56A.

erty that was the subject of the board's decisions is located in Holliston and consists of 150 separate parcels represented by 150 tax bills. On January 1, 1978, and January 1, 1979, the estate of Angus J. McPherson was the assessed owner of sixty-two of the 150 parcels. The assessed owners of the other eighty-eight parcels were as follows: Holliston Realty Co., Inc. (Holliston Realty), seventy-one parcels; Pinecrest Country Club, Inc. (Pinecrest), seven parcels; and various straws of McPherson, ten parcels. McPherson, who died in February, 1977, owned all of the stock of Holliston Realty, and owned fifty percent of the stock of Pinecrest. Donlon and Lembo were appointed special coadministrators of Mc-Pherson's estate in the summer of 1977. Presumably, the coadministrators have prosecuted the applications for abatement of taxes assessed to the parcels owned by Holliston Realty, Pinecrest and McPherson's straws, pursuant to the sentence in G. L. c. 59, § 59, which provides: "If a person other than the person to whom a tax on real estate is assessed . . . has an interest therein . . . and pays the tax, he may thereafter prosecute in his own name any application, appeal or action provided by law for the abatement or recovery of such tax . . . ."

The board of assessors of Holliston (assessors) assessed the 150 parcels at an aggregate amount of $637,800 for fiscal 1979 and at an aggregate amount of $528,700 for fiscal 1980. The appellants applied for abatements of taxes assessed on the 150 parcels for the two fiscal years, alleging that the parcels were either overvalued or disproportionately assessed. The assessors denied the applications, and the appellants appealed to the board under the formal procedure. After a hearing, the board concluded that it lacked jurisdiction to hear the fiscal 1980 appeals, and decided against the appellants on the merits of the fiscal 1979 appeals. Pursuant to a request by the appellants, the board thereafter issued its findings of fact and report. See G. L. c. 58A, § 13.

The findings of the board which are relevant to whether it had jurisdiction to hear the appellants' claims of overvaluation for fiscal 1980 will be detailed later in this opinion in

conjunction with a discussion of the board's ruling on that issue. The findings of the board which are relevant to the appellants' claims of overvaluation for fiscal 1979 are as follows.[3] The real estate owned by Pinecrest is improved by a golf course and a clubhouse with a parking area. The real estate of the other owners of the Holliston property consists primarily of lots in subdivisions known as Pinecrest Homes I and Pinecrest Homes II, and scattered lots on streets near the golf course. The lots in the subdivisions are laid out in a checkerboard pattern so that adjoining lots have different owners. Most of the lots measure approximately 18,000 square feet and have frontages of 100 feet. These dimensions satisfied the frontage and area requirements of the Holliston zoning by-law when the subdivisions were laid out in the early 1960's. The zoning by-law in effect on January 1, 1978, required each residential lot within the district of the subject property to have an area of at least 40,000 square feet and a frontage of at least 180 feet.[4]

The board found that, when Donlon and Lembo were appointed coadministrators of McPherson's estate in 1977, there were insufficient liquid assets to pay real estate taxes and make mortgage payments on the 150 parcels. To ward off any foreclosure by the bank holding the mortgage on the 150 parcels, the coadministrators arranged to have Haynes Management, Inc. (Haynes), take an assignment of the note and mortgage from the bank in 1978. Haynes managed the golf course during 1978, and ultimately purchased the 150 parcels at a foreclosure sale held on March 30, 1979.

In addition to making these findings, the board reported the following testimony. An appraiser hired by the coadministrators, a former deputy assessor for the town of Brain-

---

[3] The board's findings of fact are final if they are supported by substantial evidence and are not mutually inconsistent. See G. L. c. 58A, § 13; *Lynn Hosp.* v. *Assessors of Lynn*, 383 Mass. 14, 20-21 (1981).

[4] The board found that the 1978 zoning by-law required a minimum frontage of 150 feet. That by-law, however, was introduced in evidence, and shows that the frontage requirement for residential lots in the district was 180 feet, not 150 feet.

tree, testified that he had made two appraisals of the 150 parcel tract. The first, in April, 1978, was in the amount of $235,000, and the second, in 1980, was in the amount of $100,000. In the first appraisal he determined that there was no market for golf courses in the area, and that the highest and best use of the property was for development as house lots. He determined that none of the lots in the subdivisions known as Pinecrest Homes I and Pinecrest Homes II, and only sixteen of the lots on existing streets near the golf course, could be developed under the zoning by-law then in existence, which required a minimum area of 40,000 square feet and a minimum frontage of 180 feet. The Holliston building inspector disagreed with the appraiser's premise that the frontage and area requirements of the by-law then in existence applied to the subdivision lots. He testified that the subdivision lots were immune from those requirements, and consequently could be developed, because the lots had been laid out before the current by-law became effective. The appellants' appraiser valued each of the sixteen lots he deemed buildable at $10,000, less $6,000 for fill costs, for a net lot value of $4,000. His opinion of value was based on sales of other lots and some percolation tests done in the area. The appraiser considered all remaining land as open land and valued it at $1,000 per acre. He revised his opinion of value in 1980 to $100,000 because of percolation tests that recently had been performed on the property. According to the appraiser, only two of thirteen tests had produced satisfactory results. He opined that the real estate could not be developed unless the town or a private developer installed a sewer system for the property. He did not think this could be done for some time. However, since the golf course produced income, he opined that the entire property had a value of $100,000. There was no evidence of the income and expenses of the golf course.

The engineer for the Holliston board of health testified that he was present when some of the percolation tests were performed and that he had no opinion whether the property would meet ground water requirements for the installation

of septic systems. He preferred to reserve his opinion until such time as percolation tests were performed on each lot. Only three applications for building permits had been made in this area since 1974 and they had not been approved, largely because of engineering deficiencies in the percolation tests.

Additional testimony relevant to the appellants' claims of overvaluation for fiscal 1979, but not reported by the board, was offered by appellant Lembo. He testified that all prospective bidders at the foreclosure sale of the 150 parcels on March 30, 1979, were handed a sheet of paper by the Holliston tax collector, which showed that $73,874.74 in taxes were owed on the property. One of the active bidders at the sale held an attachment on the property in connection with a pending suit against McPherson in which he sought to recover $50,000. The other active bidder was Haynes, who took the property with a bid of $163,000.

I. *The Appellants' Standing — Fiscal 1979 and 1980.*

"Proceedings for abatement are statutory . . . [and] must be commenced by an application conforming to statutory requirements or the Appellate Tax Board is without jurisdiction of the proceedings." *Boston Five Cents Sav. Bank* v. *Assessors of Boston,* 311 Mass. 415, 416 (1942). General Laws c. 59, § 59, defines those categories of persons who may seek an abatement. One category includes persons "upon whom a tax has been assessed or the administrator of the estate of such person." As coadministrators of the estate of McPherson, Donlon and Lembo were entitled under that provision to apply for an abatement of taxes assessed to McPherson's estate. They were not entitled under that provision, however, to apply for an abatement of taxes assessed to Holliston Realty, Pinecrest, or McPherson's straws. Section 59 also provides that tenants and mortgagees may, in certain circumstances, seek an abatement of taxes assessed on the rented or mortgaged real estate. The coadministrators were neither tenants nor mortgagees. Consequently, their right to seek an abatement of taxes assessed to Holliston Realty, Pinecrest, and the straws, depends on the provi-

sion of § 59 which allows "a person other than the person to whom a tax on real estate is assessed" to seek an abatement of a tax on real estate if he "is the owner thereof, or has an interest therein, or is in possession thereof, and pays the tax." Once a person brings himself within this provision, "he may thereafter prosecute in his own name any application, appeal or action provided by law for the abatement or recovery of such tax." For the purpose of this analysis, we assume that the appellants had an "interest" in the real estate assessed to Holliston Realty, Pinecrest, and McPherson's straws.

By the express terms of G. L. c. 59, § 59, a person having an "interest" in real estate has the right to apply for an abatement of a tax assessed thereon to another person only if he or she "pays the tax." *Boston Five Cents Sav. Bank* v. *Assessors of Boston, supra* at 417-418. This requirement is jurisdictional, and an application for abatement filed prior to the payment of the tax is a nullity. *Id.* When the coadministrators appealed from the assessors' denial of their applications for abatements, they filed petitions with the board which specifically stated that "no tax has been paid." This evidence of the appellants' failure to pay the taxes assessed before applying for an abatement of those taxes was uncontradicted. Because they applied for abatements of taxes assessed to Holliston Realty, Pinecrest, and McPherson's straws before paying the taxes assessed, those applications were a nullity. *Boston Five Cents Sav. Bank* v. *Assessors of Boston, supra.* As such, those applications were not "applications provided by law," G. L. c. 59, § 59, and the purported appeals to the board were not "appeal[s] . . . provided by law." For that reason, the board was without jurisdiction over them. *Id.* at 418. Accordingly, we dismiss the appeals to the board by the coadministrators with respect to the taxes assessed to Holliston Realty, Pinecrest, and McPherson's straws. See *id.* at 420. The remainder of this opinion addresses only those arguments raised by the appellants which relate to taxes assessed to the estate of McPherson.

II.  *The Fiscal 1979 Appeal.*

The property assessed to the estate of McPherson consists of undeveloped lots in subdivisions known as Pinecrest Homes I and Pinecrest Homes II, and various other lots on streets near the Pinecrest Country Club.  The appellants raise a two-pronged challenge to the assessed valuation of these lots.  First, they argue that at the hearing before the board they introduced credible evidence in the form of expert opinion testimony that the value of the lots was substantially less than their assessed value.  Second, they make several arguments challenging the methods by which the assessors valued the lots.

In considering these arguments, we bear in mind that the taxpayer bears the burden of proof on the issue of valuation and that until the taxpayer sustains this burden, the board properly may presume that the assessors' valuation was valid.  *Foxboro Assocs.* v. *Assessors of Foxborough,* 385 Mass. 679, 684 (1982).  *Schlaiker* v. *Assessors of Great Barrington,* 365 Mass. 243, 245 (1974).  However, where the taxpayer introduces persuasive evidence of overvaluation, a decision of the board in favor of the assessors must be supported by substantial evidence.  *Schlaiker* v. *Assessors of Great Barrington, supra* at 245 n.2.[5]  See *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456, 465-466 (1981).  The taxpayer may present persuasive evidence of overvaluation either by exposing flaws or errors in the assessors' method of valuation, or by introducing affirmative evidence of value which undermines the assessors' valuation.  In determining whether a decision of the board is supported by substantial evidence, we consider the entire record.  *New Boston Garden Corp.* v. *Assessors of Boston, supra* at 466.  "The substantiality of evidence must take into account whatever in the record fairly detracts from its

---

[5] Where the taxpayer introduces no persuasive evidence of overvaluation, "a conclusion that a presumptively valid assessment must stand is by its nature not such an affirmative finding as to require substantial evidence to support it."  *Schlaiker* v. *Assessors of Great Barrington,* 365 Mass. 243, 245 n.2 (1974).

weight." *Id.,* quoting *Cohen* v. *Board of Registration in Pharmacy,* 350 Mass. 246, 253 (1966).

A. *The Appellants' Affirmative Evidence of Value.*

Since the appellants mistakenly believed that they had the right to prosecute applications for the abatement of taxes assessed to Holliston Realty, Pinecrest, and the straws of McPherson, they introduced evidence of the value of the entire 150 parcels. This evidence consisted of expert testimony of an appraiser and evidence of a foreclosure sale of the property on March 30, 1979. We consider this evidence only to the extent that it bears upon the value of the 62 parcels assessed to the estate of McPherson.

The substance of the appraiser's testimony is recited at the outset of this opinion. The board gave "very little weight" to his opinions of value. It concluded that the appraiser's first opinion of value of $235,000, made in 1978, "was not supported by sufficient data for the board to come to any conclusion of value for the 150 lots comprising the subject property." The board concluded that the appraiser's second opinion of value of $100,000, made in 1980, was "too remote and inconclusive to arrive at a fiscal year 1979 value."

"In general, the weight to be given to opinion evidence, not shown to be based on legally incompetent foundations, is for the board." *Boston Edison Co.* v. *Assessors of Watertown,* 387 Mass. 298, 307 (1982). However, "[e]vidence of a party having the burden of proof may not be disbelieved without an explicit and objectively adequate reason." *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456, 470-471 (1981), quoting L.L. Jaffe, Judicial Control of Administrative Action 598, 607 (1965). We think the board was warranted in concluding that the opinions of the appellants' appraiser were entitled to little weight in so far as they related to the value of the 150 lots. The board also properly could have accorded little weight to the appraiser's opinions in so far as they related to the value of the sixty-two lots assessed to the estate of McPherson. The opinions were premised on inconclusive percolation tests and on the erroneous

assumption that the subdivision lots were not buildable because the approval of the plans for the subdivisions had been rescinded. See *infra*.

The appellants also rely on the sale of the Holliston property to Haynes at the foreclosure sale held on March 30, 1979, to support their claim of overvaluation. Real estate is overvalued if it is assessed in excess of its "fair cash value," see G. L. c. 59, § 38, which means its fair market value. *Boston Edison Co.* v. *Assessors of Watertown, supra* at 301. "Fair market value means 'the price that an owner willing but not compelled to sell ought to receive from one willing but not compelled to buy.'" *Id.*, quoting *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. 60, 63 (1941). We have deemed actual sales of property to be "very strong evidence of fair market value, [because] they represent what a buyer has been willing to pay to a seller for a particular property." *New Boston Garden Corp.* v. *Assessors of Boston, supra* at 469, quoting *First Nat'l Stores, Inc.* v. *Assessors of Somerville*, 358 Mass. 554, 560 (1971). However, "the evidentiary value of such sales in less than arms-length transactions is diminished." *Id.* The circumstances surrounding the foreclosure sale in this case were such that the board properly could have found that the sale was neither voluntary nor at arm's length and that, consequently, the sale price had limited relevance to establishing the fair market value of the entire property or the sixty-two lots assessed to the estate of McPherson.

B. *The Appellants' Challenge to the Assessors' Methods of Valuation.*

1. *The subdivision lots.* The subdivisions known as Pinecrest Homes I and Pinecrest Homes II were divided into individual lots according to plans submitted to the Holliston planning board and approved by that board on June 4, 1963. Most of the lots were laid out in a checkerboard pattern, so that adjoining lots had different owners. See generally G. L. c. 40A, § 6; *Sturges* v. *Chilmark*, 380 Mass. 246, 260-261 (1980); *Lee* v. *Board of Appeals of Harwich*, 11 Mass. App. Ct. 148, 151 n.4 (1981). The assessed owners

of the various lots were Holliston Realty, McPherson's estate, and various straws of McPherson. The lots were assessed individually. Those that were not checkerboarded were assessed as nonbuildable and valued as open land at $1,000 per acre because they did not conform to the frontage requirements of the zoning by-law in effect on January 1, 1978. The lots that were checkerboarded were assessed as buildable and valued at $0.28 per square foot. These lots also did not conform to the frontage requirements of the Holliston zoning by-law in effect on January 1, 1978, but were valued as buildable on the strength of a grandfather clause to that by-law. That clause provided: "A lot or parcel of land having an area or frontage of lesser amounts than required [by the schedule of intensity regulations established by this by-law] may be considered as coming within the area and frontage requirements of this section provided such lot or parcel of land was shown on a plan or described in a deed duly recorded or registered at the time of the adoption of this by-law or subsequent amendment hereto and did not at the time of such adoption or amendment adjoin other land of the same owner available for use in connection with such lot or parcel." Town of Holliston Zoning By-law, § IV-A (4) (1978). See also G. L. c. 40A, § 6, as amended through St. 1977, c. 829, § 3D.

The appellants' first objection to the assessors' valuation of the subdivision lots assessed to the estate of McPherson is that two of these lots were valued as if they had been properly checkerboarded when in fact they adjoined each other. Therefore, they argue, those lots could not properly be valued as buildable. To support their argument, the appellants rely exclusively on a map of the Holliston property which is part of the record and which does show that the two lots are assessed to McPherson and adjoin each other.

Although the appellants are correct in asserting that the two lots could properly be assessed as buildable only if they had been checkerboarded at the time of the adoption of the zoning by-law in effect on January 1, 1978, their claim of overvaluation must be rejected. The map on which the

appellants rely is undated. Nothing in the record indicates that that map represents the ownership of the subdivision lots at the time of the adoption of the zoning restrictions in effect in 1978. Since the appellants failed to introduce persuasive evidence that the lots in question were in common ownership at that time, they failed to sustain their burden of proof, and the board properly presumed that the assessors' method of valuation was valid. See *Schlaiker* v. *Assessors of Great Barrington,* 365 Mass. 243, 245 & n.2 (1974).

The appellants also contend that it was "ridiculous" to value the subdivision lots assessed to the estate of McPherson as if they were within existing subdivisions when the town planning board voted on February 22, 1978, to rescind its approval of the plans for Pinecrest Homes I and Pinecrest Homes II. The appellants' argument is misconceived. Under our statutes, "taxes on real estate are assessed annually, not . . . for any period of time, but rather as of a fixed day." *Miller* v. *Wadsworth, Howland & Co.,* 296 Mass. 172, 174 (1936). See *Irving Usen Co.* v. *Assessors of Boston,* 309 Mass. 544, 545 (1941); *Sarris* v. *Assessors of Swampscott,* 2 Mass. App. Ct. 841, 842 (1974). That date generally is "January first preceding the fiscal year with respect to which the taxes are assessed." G. L. c. 59, § 21. See also G. L. c. 59, § 11 ("Taxes on real estate shall be assessed . . . to the person who is the owner on January first"). Thus, the Holliston assessors were required to determine the fair cash value of the property held by the estate of McPherson on the basis of its condition, status, and value as of January 1, 1978. See *Sarris* v. *Assessors of Swampscott, supra.* See also *Assessors of Hamilton* v. *Iron Rail Fund of Girls Clubs of Am., Inc.,* 367 Mass. 301, 306 (1975). On that date, the plans for the subdivisions had not been rescinded by the planning board. Nothing in the record suggests that rescissions of the plans was even proposed by that date. The assessors properly valued the lots as being within an existing subdivision.

The appellants also argue that "[o]nly one ground water test conducted in the former subdivisions area passed; hence, nearly all of the former subdivisions lands were non-buildable

for that reason alone." We reject this argument. The board was entitled to conclude that the data on which the appellants relied did not support their contention that the lots were not buildable because of ground water considerations. Only thirteen ground water tests were conducted on the entire Holliston property. It is unclear from the record before us whether any of these tests was conducted on the lots in Pinecrest Homes I and Pinecrest Homes II.

The appellants argue further that "[t]he Assessors' practice of assessing lots on 'paper' streets in woodlands at the same value as lots on existing public ways is totally unsupportable." Although the location of a lot on an existing public way may enhance its value, the appellants have failed to demonstrate that the assessors' practice resulted in any overvaluation of the lots assessed to the estate of McPherson.

2. *The frontage lots.* The remainder of the property assessed to the estate of McPherson consisted of undeveloped lots on existing public ways. The assessors assessed all these lots as buildable on the ground that they had been properly checkerboarded and thus were immune from the requirements of the zoning by-law in effect on January 1, 1978. The appellants argue on several grounds that these lots were overvalued.

They argue first that five of the lots were not properly checkerboarded, and for that reason, should not have been assessed as buildable. The appellants again rely on the map representing the ownership of the Holliston property to support their claims. That map does show that the five lots in question are assessed to the estate of McPherson and adjoin each other. Again, however, nothing in the record indicates that the map represents the ownership of the frontage lots at the time of the adoption of the zoning restrictions in effect in 1978.

The appellants' argument is the same as one already considered and rejected in the preceding section of this opinion. Their claim of overvaluation fails because they presented no persuasive evidence that the five frontage lots were not properly checkerboarded when the zoning by-law in effect

in 1978 was adopted. Since the appellants failed to sustain
their burden of proof, the board properly concluded that
the assessors' method of valuation was valid. See *Schlaiker
v. Assessors of Great Barrington*, 365 Mass. at 245-246 & n.2
(1974).

The appellants challenge the valuation of seven of the
frontage lots assessed to McPherson on the ground that por-
tions of all these lots "have wetland-designated areas within
their borders" and for that reason are not buildable. The
basis for this allegation is the town's Wetlands and Flood-
plain Zoning Map, which is part of the record. An exami-
nation of the map indicates that the degree to which the
seven lots are overlaid by wetlands ranges between five per
cent and eighty per cent. All of the lots are between .41 and
.45 acres. The Holliston zoning by-law provides that "[n]o
new building or structure, except fences, shall be erected or
constructed" on the wetland areas as defined by the wet-
lands map. The by-law further provides that a variance
may be granted under certain circumstances to allow build-
ing on a wetland area. Nothing in the record suggests that
the appellants could have obtained such a variance.

We think it is unfair to assess a lot between .41 and .45
acres in size as buildable when eighty per cent of it is over-
laid by wetlands which cannot be built upon. The degree
to which lots of this size are overlaid by protected wetlands
should be an important consideration in determining wheth-
er they are buildable. An assessor testified, however, that
the wetland composition of the seven lots in question did not
affect their valuation. We conclude that the appellants satis-
fied their burden of presenting persuasive evidence of over-
valuation, at least with respect to those lots almost exclusively
overlaid by protected wetlands, and that the decision of the
board to sustain the assessors' valuation of those lots is not
supported by substantial evidence. Consequently, that
aspect of the board's decision must be reversed. We remand
the case to the board with instructions that it reconsider the
fair cash value of those lots in light of their wetland composi-
tion. We also reverse the decision of the board sustaining the

assessors' valuation of the other lots that were partially over-
laid by wetlands, and instruct the board on remand to re-
consider the value of those lots. We do so because the board
already will be required to reconsider the value of the lots
almost entirely overlaid by wetlands, because of the serious-
ness of the board's failure to consider the wetland composi-
tion of the seven lots, and because of the difficulty of our
determining whether these lots are so overlaid by protected
wetlands that they cannot properly be assessed as buildable.

An additional argument the appellants raise in support of
their claim of overvaluation is that "[t]he evidence showed
that the areas containing all the other protected, non-con-
forming frontage lots were not among the two areas which
passed ground water tests." The appellants' contention is
premised on the testimony of a civil engineer who conducted
thirteen percolation tests on the Holliston property between
October 9, 1979, and January 30, 1980, to determine whether
it was buildable. The engineer testified that a "majority" of
the thirteen tests were performed "on the corner of Prentice
and Highland" Streets, that others were done "in back of
the Pro Shop," and that some others were performed at the
corner of Prentice and Mill Streets. According to the engi-
neer, only two sets of the tests were successful. One set was
conducted at the corner of Prentice and Highland Streets
and the other was conducted in back of the Pro Shop. This
is all the evidence before us as to where the tests were per-
formed. Apparently, a chalk used at the hearing was marked
with the locations of the ground water tests, but that chalk
is not part of the record.

We conclude that the engineer's testimony did not consti-
tute persuasive evidence that the frontage lots assessed to the
estate of McPherson were overvalued. Consequently, the
board was justified in presuming that the assessors' valua-
tion of those lots was valid. See *Schlaiker* v. *Assessors of
Great Barrington*, 365 Mass. 243, 245 (1974). Even if we
assume that a lot which fails a percolation test is not builda-
ble, and that the results obtained from the tests in this case
were accurate and reliable, the limited number of tests con-

ducted, and the record evidence of their location, do not permit an inference that any of the frontage lots assessed to the estate of McPherson was not buildable because of ground water.

The appellants' final argument in support of their claim of overvaluation is that although one of the frontage lots "might have a potential for pancaking with fill in order to artificially raise the ground level so as to pass ground water tests, . . . the fill costs were not taken into consideration by the Assessors and might be equal to the assessed valuations placed on the lots." This argument is based entirely on the testimony of the appellants' appraiser, who stated that he valued the lot in question in his original appraisal at $10,000, minus $6,000 for fill costs, for a net value of $4,000. The appraiser testified that his cost figure was based on unverified information supplied by an engineering firm. The firm's information was based on studies of "some" of sixteen frontage lots deemed by the appraiser to be buildable. There is nothing in the record that indicates whether any of these studies were conducted on the lot in question.

"In general, the weight to be given opinion evidence . . . is for the board." *Boston Edison Co.* v. *Assessors of Watertown*, 387 Mass. 298, 307 (1982). The board was entitled to conclude that the appraiser's opinion that pancaking was necessary in order to build on the lot assessed to the estate of McPherson, and that the cost of such pancaking would be $6,000, was unsupported. In addition, there is nothing in the record which suggests that the board did not consider fill costs in assessing the property. Consequently, we reject the appellants' claims. See *Foxboro Assocs.* v. *Assessors of Foxborough*, 385 Mass. 679, 683 (1982).

III. *The Fiscal 1980 Appeal.*

The board ruled that it had no jurisdiction to hear the appellants' appeals from the denials of their applications for abatements of taxes assessed for fiscal 1980. Since we have already determined that the appellants had no right to prosecute appeals for the abatement of taxes assessed in fiscal years 1979 and 1980 to Holliston Realty, Pinecrest, and the

straws of McPherson, our review of the board's ruling is limited to the question whether the board was correct in concluding that it had no jurisdiction over the appeals relating to taxes assessed for fiscal 1980 to the estate of McPherson.

The board's ruling that it had no jurisdiction over the fiscal 1980 appeals was based on its conclusion that the appellants failed to file their applications for abatement within thirty days after the tax bills were sent. General Laws c. 59, § 59, provides in part: "A person upon whom a tax has been assessed or the administrator of the estate of such person . . ., if aggrieved by such tax, may . . . on or before the thirtieth day after the date on which the bill or notice was . . . sent, apply in writing to the assessors . . . for an abatement thereof . . . ." Filing within the thirty-day period prescribed by § 59 is a jurisdictional requirement. "[T]he board must dismiss an appeal from the denial of an abatement for lack of jurisdiction if the application for abatement was not timely under G. L. c. 59, § 59." *Roda Realty Trust* v. *Assessors of Belmont,* 385 Mass. 493, 495 (1982).

The board concluded that the appellants' applications for abatements were not timely under G. L. c. 59, § 59, on the basis of its findings that the tax bills for fiscal 1980 were mailed on December 20, 1979, to each person assessed, that the appellants mailed the applications for abatement for fiscal 1980 to the assessors on January 21, 1980, and that the assessors received those applications on January 22, 1980. These findings clearly support the board's decision to dismiss the appellants' appeals for lack of jurisdiction. The appellants contend, however, that the tax bills were sent to the offices of Haynes Management in Wellesley, not to the "person assessed." They maintain that this misdirection of the tax notices invalidated those notices or tolled the running of the thirty-day period prescribed by G. L. c. 59, § 59. See generally G. L. c. 60, § 3; *Canron, Inc.* v. *Assessors of Everett,* 366 Mass. 634, 639 (1975).

We need not decide this issue. The appellants' factual assertion is based entirely on the testimony of the property manager of Haynes. The board was entitled to disbelieve

this testimony, see *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456, 469 (1981), and it appears that it did just that. Just before it found that the tax bills for fiscal year 1980 were mailed to each person assessed, the board reported that the Holliston tax collector "made an affidavit that she mailed the tax bills for fiscal year 1980 to each person assessed on December 20, 1979." The board then remarked: "The property manager of the corporation that purchased the subject property at a foreclosure sale on March 30, 1979 [Haynes], testified for the appellant[s] that the tax bills were received at their place of business . . . . He did not say when the bills were received. [Haynes' address] does not appear on any of the tax bills." We read these remarks as indicating that the board disbelieved the property manager's testimony. The board was entitled to do so, and to rely on the affidavit of the tax collector.

The appellants' appeals from the denials of their applications for the abatement of taxes assessed in fiscal 1979 and 1980 to Holliston Realty Co., Inc., Pinecrest Country Club, Inc., and the straws of McPherson are dismissed. The decision of the board rejecting the appellants' claims that property assessed to the estate of McPherson was overvalued in fiscal 1979 is affirmed in part and reversed in part and remanded to the board for further proceedings in accordance with this opinion. The decision of the board, dismissing for lack of jurisdiction the appellants' appeals from the denials of their applications for the abatement of taxes assessed in fiscal 1980 to the estate of McPherson, is affirmed.

*So ordered.*